# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **CORTEZ L. FRANKLIN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-12-865-F** |
| | ) | |
| **ROBERT PATTON, Director,** | ) | |
| | ) | |
| **Respondent.**[1] | ) | |

## REPORT AND RECOMMENDATION

Petitioner Cortez L. Franklin, a state prisoner appearing pro se, has filed a Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus and Brief in Support, challenging the constitutionality of his criminal conviction by the State of Oklahoma. *See* Doc. Nos. 1, 3. Respondent ODOC Director Robert Patton has filed a Response to Petition for Writ of Habeas Corpus (Doc. No. 13). United States District Judge Stephen P. Friot has referred this action to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636. As outlined herein, the undersigned recommends that the Petition be DENIED.

---

[1] In his Petition, Petitioner named the State of Oklahoma as Respondent. *See* Pet. (Doc. No. 1). As previously referred to by the Court (Doc. No. 11) and as noted in the Response to the Petition (Doc. No. 13, at 1 n.1), the proper Respondent in this proceeding is the Director of the Oklahoma Department of Corrections ("ODOC"). This position currently is held by Robert Patton. Accordingly, Director Patton is hereby substituted as the sole Respondent in this proceeding. *See Director's Office*, Okla. Dep't of Corr., http://www.ok.gov/doc/About_Us/Director's_Office/ (last visited Nov. 14, 2014); 28 U.S.C. § 2243; R. 1(a), 2(a), 12 of Rules Governing Section 2254 Cases in the United States District Courts; Fed. R. Civ. 25(d), 81(a)(4).

## I.     Relevant Case History and Issues Presented

On the morning of August 9, 2004, fifteen-year-old Marcus Ivy was seen sweeping the porch of the apartment at the Will Rogers Courts public housing complex in southwest Oklahoma City, where he lived with his brother. Pet'r's Br. (Doc. No. 3) at 11;[2] Vol. IV Trial Tr. 231, 234-35; Vol. V Trial Tr. 39, 46, 79, 80 (*State v. Franklin*, No. CF-2004-5898 (Okla. Cnty., Okla. Dist. Ct. Dec. 8-16, 2008)) (Doc. No. 15). Marcus Ivy was shot once in the stomach by a person using a handgun and, 23 days later, on September 1, 2008, died of multiple organ failure caused by the gunshot wound. Pet'r's Br. at 11; Vol. V Trial Tr. 12, 21, 22-25; Original Record ("OR") 5 (Doc. No. 15).

During the authorities' investigation, at least one eyewitness placed Petitioner at or near the murder scene, and Petitioner ultimately was charged by information with the felony crime of Murder in the First Degree. *See* OR 5-11. On December 16, 2008, after a jury trial in the District Court of Oklahoma County, Petitioner was convicted of one count of Murder in the First Degree with Malice Aforethought in violation of Title 21, Section 701.7 of the Oklahoma Statutes. Vol. VII Trial Tr. 108; OR 1643, 1706. On January 23, 2009, Petitioner was sentenced to life imprisonment without the possibility of parole, in accordance with the jury's recommendation following a second-stage sentencing proceeding in which the State had sought the death penalty. OR 64-65, 68-69, 1644, 1668, 1706; Sent'g Tr. 5 (Jan. 23, 2009) (Doc. No. 15).

---

[2] References to documents filed electronically in this Court use the page numbers assigned by the Court's electronic filing system, if applicable.

Petitioner appealed his conviction and sentence to the Oklahoma Court of Criminal Appeals ("OCCA"). OR 1721; *see Franklin v. State*, No. F-2009-96 (Okla. Crim. App. filed Feb. 3, 2009).[3] On Aug. 30, 2010, the OCCA affirmed Petitioner's conviction and sentence. OCCA Op., No. F-2009-96 (Doc. No. 13-3).

Petitioner then filed this federal habeas action and now raises seven grounds for relief: (1) the testimony of an eyewitness identifying Petitioner as the shooter was unlawfully coerced, resulting in a deprivation of due process; (2) ineffective assistance of trial counsel for failing to raise this first ground; (3) the evidence presented at trial was insufficient to support Petitioner's conviction; (4) denial of a fair trial based upon the trial court's refusal to grant a mistrial; (5) denial of a fair trial based upon the trial court's failure to give an eyewitness-identification instruction to the jury; (6) the State's improper use of peremptory challenges denied Petitioner a jury comporting with constitutional standards; and (7) cumulative error based on Grounds One through Six. *See* Pet. at 4-5; Pet'r's Br. at 17-38; Pet'r's Mot. to Supplement (Doc. No. 16) at 1-4; Doc. Nos. 16-1 to 16-5. Respondent concedes that Petitioner's claims are timely and that Petitioner exhausted his state-court remedies with respect to the grounds raised in the Petition and Brief in Support. *See* Resp't's Resp. (Doc. No. 13) at 2.

---

[3] The docket sheets for *State v. Franklin*, No. CF-2004-5898, District Court of Oklahoma County (filed Nov. 1, 2004), and *Franklin v. State*, No. F-2009-96, Oklahoma Court of Criminal Appeals (filed Feb. 3, 2009), are publicly available through http://www.oscn.net.

## II.     The Standard of Review

The Tenth Circuit recently summarized the standard of review for evaluating state-court legal determinations that have been challenged in federal court through a 28 U.S.C. § 2254 habeas proceeding:

> Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we must apply a highly deferential standard in § 2254 proceedings, one that demands that state-court decisions be given the benefit of the doubt. If a claim has been "adjudicated on the merits in State court proceedings," we may not grant relief under § 2254 unless the state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). The phrase "clearly established Federal law, as determined by the Supreme Court of the United States," *id.* § 2254(d)(1), refers to the holdings, as opposed to the dicta, of the Court's decisions as of the time of the relevant state-court decision.
>
> Under the "contrary to" clause of § 2254(d)(1), we may grant relief only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts. And under the "unreasonable application" clause, we may grant relief only if the state court identifies the correct governing legal principle from the Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. An unreasonable application of federal law is different from an incorrect application of federal law. Indeed, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.

*Dodd v. Trammell*, 753 F.3d 971, 982 (10th Cir. 2013) (alterations, citations, and internal quotation marks omitted).

Pursuant to AEDPA, factual findings made by a state trial or appellate court are presumptively correct and may be rebutted only by "clear and convincing evidence." 28

U.S.C. § 2254(e)(1). The standard for relief prescribed by AEDPA is high: "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011).

### III. Analysis

#### A. Ground One: Coercion of Testimony of Pam Watley

Pamela Watley lived in the Will Rogers Courts near the apartment where Marcus Ivy was staying and was shot on August 9, 2004. On that date, Ms. Watley was at her apartment with her mother and two daughters. Pet'r's Br. at 12-13; Vol. IV Trial Tr. 233-34, 236; Vol. V Trial Tr. 39. When first interviewed by police following the shooting, Ms. Watley denied seeing anything related to Marcus Ivy's murder. Pet'r's Br. at 12; Vol. V Trial Tr. 50, 111-13. Oklahoma City Police Department ("OCPD") detectives soon learned, however, that Ms. Watley had told acquaintances that Petitioner was the shooter. OR 1, 8; Vol. V Trial Tr. 90-91, 123-24, 126. On September 2, 2004, the police again questioned Ms. Watley; Ms. Watley again denied seeing the shooting. OR 1, 8; V Trial Tr. 123, 127, 128-30, 177.

On October 25, 2004, in an effort to obtain Ms. Watley's truthful testimony, an OCPD detective submitted a Subpoena Request Form to the Grand Jury Investigations Division of the Office of Attorney General of the State of Oklahoma. Doc. No. 13-1, at 99, 101. On October 26, 2004, Multicounty Grand Jury Subpoena No. MCGJ-03-1177

("the Subpoena") was issued by the Attorney's General's Office directing Pamela Watley to appear and testify as a witness before the multicounty grand jury on November 15, 2004.  Doc. No. 13-1, at 58.  Ms. Watley never appeared before a grand jury, however.  Instead, when served with the Subpoena on October 27, 2004, Ms. Watley agreed to further questioning by the OCPD and identified Petitioner as the gunman.  OR 8; Doc. No. 13-1, at 60; Vol. V Trial Tr. 92-94, 130-31, 132.  On November 1, 2004, the OCPD Detective who had requested the issuance of the Subpoena drafted a report, addressed to the multicounty grand jury, in which the detective stated he had obtained a "truthful eyewitness account" from Ms. Watley and had learned that Ms. Watley "saw Franklin shoot the victim."  Doc. No. 13-1, at 60.  On that same date, criminal charges were filed against Petitioner, by information rather than by grand jury indictment, for the murder of Marcus Ivy.  OR 5.  *See generally* Okla. Stat. tit. 22, §§ 301, 302.

Petitioner's criminal trial was continued on multiple occasions until commencing in December 2008.  During the time prior to trial, Ms. Watley failed to appear to testify on multiple occasions and was arrested for not meeting the terms of conditions imposed while she was released on bond.  Vol. IV Trial Tr. 227-28, 229-30; Vol. V Trial Tr. 94-95, 134-35, 150-51, 153, 154-55; OR 1440.  At the time of trial, Ms. Watley was being held in custody and testified for the State pursuant to a material-witness warrant that had been issued on November 14, 2008.  OR 1440-41, 1508-09; Vol. IV Trial Tr. 227; Vol. V Trial Tr. 103, 104.  At trial, Ms. Watley identified Petitioner in person and testified that she had seen Petitioner shoot Marcus Ivy in the stomach.  Vol. IV Trial Tr. 232-33, 238; Vol. V Trial Tr. 40, 445-46, 47-48, 79-84.

On direct appeal, Petitioner attacked Ms. Watley's identification of Petitioner as coerced through the use of an "unauthorized and unlawful" subpoena and argued that the use of Ms. Watley's testimony violated Petitioner's due process right to a fair trial. Pet'r's OCCA Br. (Doc. No. 13-1) at 17-21. The OCCA denied relief on the merits:

> Appellant claims that by using a multi-county grand jury subpoena, law enforcement officials used "unauthorized means to do indirectly what they could not do directly," that is, "to compel Watley to tell the truth." We disagree.
>
> Various constitutional and statutory provisions illustrate an obvious and fundamental principle: that a person has no right to withhold truthful information about a crime committed within our State, provided the person is not compelled to incriminate *himself* in the process. . . . .
>
> Appellant challenges the validity of the subpoena, and the very authority of [a] multi-county grand jury to command information from Watley, on various technical grounds. We need not examine these claims in detail, for several reasons. Watley never appeared before the grand jury. The evidence naming Appellant as the gunman came from Watley's live testimony at Appellant's trial – not from any prior proceeding. Appellant claims Watley was pressured into initially cooperating with police; he does not claim her testimony at trial – over four years later – was false, or even coerced. Watley had no legal right to withhold information about Appellant's commission of a crime, and Appellant hardly has any right to make the same complaint in her stead. Short of claiming that Watley committed perjury under duress, Appellant lacks standing to complain about how and why she initially decided to cooperate with the police.
>
> The chronology of Watley's contacts with authorities, the changes in her story, and the issuance of the subpoena were made abundantly clear to the jury, which was free to consider that evidence in assessing Watley's credibility. . . . . Proposition[] 1 . . . [is] denied.

OCCA Op. at 4-6 (footnotes and citations omitted) (citing *Manson v. Brathwaite*, 432 U.S. 98 (1977)).

In support of his Petition, Petitioner has resubmitted his OCCA appellate brief and has raised the same seven arguments as on direct appeal. *See* Pet. at 4-5; Pet'r's Br. at 2-

38; Pet'r's OCCA Br. at 2-38. Petitioner's Ground One attacks the procurement and issuance of the subpoena on several bases. Citing *Isaacs v. District Court of Oklahoma County*, 818 P.2d 1247 (Okla. Crim. App. 1991), Petitioner argues that "the prosecution cannot obtain an investigative subpoena prior to charges being filed." Pet'r's Br. at 10. Petitioner also attacks the Subpoena as an "unauthorized use" of the multicounty grand jury's subpoena power and asserts that the multicounty grand jury that was in session on October 26, 2004, lacked jurisdiction to issue the Subpoena. Pet'r's Br. at 10-11 (citing the Multicounty Grand Jury Act, Okla. Stat. tit. 22, §§ 350-363).

The subject matter jurisdiction of the multicounty grand jury extends by statute to the offense of murder. Okla. Stat. tit. 22, § 353(B)(1). Petitioner's cited authorities do not hold that a subpoena is unlawful because it was issued at the request of a police detective.[4] Further, Petitioner does not attack the facial validity of the Subpoena. *See* Pet'r's Br. at 17-21; Doc. No. 13-1, at 58. Petitioner's cited authorities and documents do not establish that the applicable multicounty grand jury did not review this criminal matter in its confidential proceedings.[5] Petitioner cites no authority for his proposition

---

[4] In *Isaacs*, the OCCA held that the issuance of a subpoena by a district attorney for investigative purposes in connection with a preliminary hearing on a criminal case, pursuant to Title 22, Section 258 of the Oklahoma Statutes, could not be done prior to the commencement of the criminal case. *See Isaacs*, 818 P.2d at 1249. The court in *Isaacs* did not address subpoenas to testify before a multicounty grand jury, issued on the authority of the grand jury, which are governed by article 2, section 18 of the Oklahoma constitution and Title 22, Sections 350 to 363 of the Oklahoma Statutes.

[5] *See generally In re Multicounty Grand Jury, State of Okla.*, No. SCAD-03-46 (Okla. Feb. 23, 2005) (Final Report of Ninth Multicounty Grand Jury empaneled August 19, 2003, stating that 1623 subpoenas were issued during its session), *available at*

that "[t]here was no grand jury investigation of this case." Pet'r's Br. at 20. Elsewhere in his brief, Petitioner concedes a lack of support for this proposition by stating "there is *no indication*" that the multicounty grand jury reviewed the subpoenaed information and that "the paperwork *indicates*" that the Subpoena was issued based only upon a detective's request. *Id*. at 20 (emphasis added).

Even assuming the provenance of the Subpoena was not in accordance with Oklahoma law, however, such a violation of state law does not, by itself, amount to a deprivation of due process to Petitioner in his criminal proceedings. In a habeas action, a federal court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Id.* at 67-68. "Federal habeas corpus relief does not lie for errors of state law" such as the alleged infirmities cited by Petitioner. *See id.* at 67 (internal quotation marks omitted).

Rather, the pertinent question is whether admission of Ms. Watley's testimony violated Petitioner's due process rights under the Fourteenth Amendment. To implicate the Due Process Clause, Petitioner must demonstrate that Ms. Watley's eyewitness identification of Petitioner was "procured under unnecessarily suggestive circumstances arranged by law enforcement." *See Perry v. New Hampshire*, 132 S. Ct. 716, 730 (2012); *Manson v. Brathwaite*, 432 U.S. 98, 112-16 (1977); *Neil v. Biggers*, 409 U.S. 188, 198

---

https://www.oag.ok.gov/oagweb.nsf/0/edafd737958b02df862572b400738e78/$FILE/MCGJ%20Final%20Report%2011-28-06.pdf.

(1972). The Supreme Court has recognized that a "due process check" is applied to the admission of eyewitness identification "when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Perry*, 132 S. Ct. at 720. Relying on its prior decisions, the Court laid out the applicable framework for when such a "check" is required:

> Synthesizing previous decisions, we set forth in *Neil v. Biggers*, and reiterated in *Manson v. Brathwaite*, the approach appropriately used to determine whether the Due Process Clause requires suppression of an eyewitness identification tainted by police arrangement. The Court emphasized, first, that due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary. Even when the police use such a procedure, the Court next said, suppression of the resulting identification is not the inevitable consequence.

> A rule requiring automatic exclusion, the Court reasoned, would "go too far," for it would "keep evidence from the jury that is reliable and relevant," and "may result, on occasion, in the guilty going free." *Brathwaite*, 432 U.S., at 112; *see id.*, at 113 (when an "identification is reliable despite an unnecessarily suggestive police identification procedure," automatic exclusion "is a Draconian sanction," one "that may frustrate rather than promote justice").

> Instead of mandating a *per se* exclusionary rule, the Court held that the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a "substantial likelihood of misidentification." *Biggers*, 409 U.S., at 201. "Reliability of the eyewitness identification is the linchpin" of that evaluation, the Court stated in *Brathwaite*. Where the "indicators of a witness'[s] ability to make an accurate identification" are "outweighed by the corrupting effect" of law enforcement suggestion, the identification should be suppressed. Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury.

*Perry*, 132 S. Ct. at 724-25 (alterations and citations omitted).

Applying its holdings in *Brathwaite* and *Biggers*, the *Perry* Court rejected the criminal defendant's contention that admission of an eyewitness identification made

under arguably suggestive circumstances should be subject to pretrial reliability screening even where the police did not arrange those circumstances. *See id.* at 725-30. Rather, "when no improper law enforcement activity is involved, . . . it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." *Id.* at 721; *see also Snow v. Sirmons*, 474 F.3d 693, 720 (10th Cir. 2007) ("When a pretrial identification occurs under impermissibly suggestive circumstances and the in-court identification of the witness is unreliable, the identification should be excluded."); *Howard v. Warden, Lebanon Corr. Inst.*, 519 F. App'x 360, 366 (6th Cir. 2013) ("When determining whether to suppress an eyewitness identification, a court should not consider the reliability of eyewitness evidence . . . unless the defendant . . . prov[es] that the police employed an unduly suggestive identification procedure.").[6]

---

[6] Although Respondent cites the 2012 *Perry* case without elaboration, this Court is limited under AEDPA to examining federal law that was "clearly established" on August 30, 2010, the date on which Petitioner's state-court conviction became final through conclusion of direct review. *See* Resp't's Resp. (Doc. No. 13) at 8; 28 U.S.C. §§ 2244(d)(1)(A), 2254(d)(1). As noted by the Sixth Circuit Court of Appeals, however, *Perry* primarily was merely a clarification and "reaffirmation" of the principles outlined in *Biggers* (1972) and *Brathwaite* (1977). *See Howard*, 519 F. App'x at 364, 369-70 (upholding district court's denial of undue-suggestiveness habeas claim pursuant to *Perry* where state-court ruling predated *Perry* by six years). Further, it is the "old law" summarized and reaffirmed in *Perry*—i.e., the well-established due-process principles applicable to eyewitness identification evidence—rather than any "new law"—i.e., the Court's refusal to extend *Brathwaite* to the specific circumstances of *Perry*, which are inapposite here—that is relevant to the instant proceeding. The undersigned has

Even if assumed true, Petitioner's argument that the underlying issuance of the Subpoena violated Oklahoma law does not sufficiently support a claim for federal habeas corpus relief. As the OCCA accurately noted, Petitioner takes issue with the procedure employed to obtain Ms. Watley's initial identification of Petitioner as the gunman in 2004, rather than with how Ms. Watley came to testify and identify Petitioner as the gunman at the trial in December 2008. *See* Pet'r's Br. at 17-21. The State did not attempt to rely upon any pretrial identification of Petitioner or to admit such evidence at trial, so no "due process check" was required on that preliminary identification. *See Perry*, 132 S. Ct. at 723 (instructing that the Due Process Clause imposes a constraint "[o]nly when evidence 'is so extremely unfair that its *admission* violates fundamental conceptions of justice.'" (emphasis added) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990))). Nor does Petitioner cite any support for the proposition that an improperly issued grand jury subpoena, standing alone, renders any further questioning by police (not before a grand jury) "unnecessarily suggestive" and therefore subject to possible exclusion on due process grounds. *Cf. id.* at 728 ("The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule

---

considered these underlying and longstanding principles in assessing Petitioner's claim and in reviewing the state court's determination pursuant to AEDPA. *See, e.g.*, *Howard*, 519 F. App'x at 366-69; *Fowler v. Joyner*, 753 F.3d 446, 453-58 (4th Cir. 2014) (applying *Perry* and the "clearly established constitutional principles" outlined therein to affirm a denial of habeas relief on in-court-identification claim the state court had rejected in 2001); *see also* OCCA Op. at 5 n.3 (citing *Brathwaite*, 432 U.S. 98); *Biggers*, 409 U.S. at 198; *cf. Snow*, 474 F.3d at 720.

requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness.").

As far as the evidence that was admitted and considered by the jury, it cannot be reasonably concluded that Ms. Watley's trial testimony was the product of police conduct creating "unnecessarily suggestive circumstances" or a "substantial likelihood of misidentification," *See Perry*, 132 S. Ct. at 726; *Biggers*, 409 U.S. at 198; *cf. Fowler*, 753 F.3d at 453-58 (rejecting habeas claim that witness's in-court identification of petitioner was the product of impermissibly suggestive police tactics prior to trial). Although Petitioner broadly states that Ms. Watley's "testimony" was compelled through issuance of the Subpoena, Ms. Watley's *trial* testimony was four years removed from and elicited independently of the Subpoena's directive. Petitioner's attack does not extend to the State's use of a material-witness warrant to procure Ms. Watley's testimony at trial. *See* Pet'r's Br. at 17-21; OCCA Op. at 4 n.4. Further, defense counsel vigorously cross-examined Ms. Watley regarding her pretrial identification of Petitioner as the gunman, as well as Ms. Watley's version of events and ability to view the shooting on August 9, 2004. Vol. V Trial Tr. 106, 109, 112-13, 118-19, 122-24, 127-32, 135-46, 158-63, 165-67; *cf. Perry*, 132 S. Ct. at 721 (instructing that when there is no arrangement of suggestive circumstances by law enforcement, rights and opportunities such as "vigorous cross-examination" and "protective rules of evidence" suffice to test reliability of identification evidence). The jury was fully informed as to the multiple efforts by authorities to secure Ms. Watley's identification of Petitioner prior to and at trial.

"The due process check for reliability, *Brathwaite* made plain, comes into play only after the defendant establishes improper police conduct." *Perry*, 132 S. Ct. at 726. In both *Brathwaite* and *Perry*, the Supreme Court made clear that "evidence obtained under unnecessarily suggestive circumstances," such as when a witness is faced with a rigged lineup, is excluded on a case-by-case basis as a deterrent to improper police action. *See id.*; *Brathwaite*, 432 U.S. at 112. This deterrence rationale is "inapposite" in the instant case, where "the police engaged in no improper conduct" with respect to the in-court testimony. *See Perry*, 132 S. Ct. at 719. Absent any showing that there was "a very substantial likelihood of irreparable misidentification," Ms. Watley's identification was "for the jury to weigh." *Brathwaite*, 432 U.S. at 116 (internal quotation marks omitted). "[E]vidence with some element of untrustworthiness is customary grist for the jury mill." *Id.*; *cf. Robison v. Ward*, 232 F. App'x 785, 788-89 (10th Cir. 2007) (rejecting habeas claim that eyewitness identification violated due process where witness had not previously known the defendant but expressed "absolute certainty" of defendant's identity over one year later).

Petitioner has not shown, and the record does not reflect, that the in-court identification evidence actually admitted and considered by the jury in Petitioner's criminal case was coerced, false, or the result of unnecessarily suggestive police procedure. The admission of Ms. Watley's in-court identification of Petitioner did not render Petitioner's trial fundamentally unfair, and the OCCA's adjudication of this claim was neither contrary to nor an unreasonable application of clearly established federal law. Relief should be denied on Ground One.

**B. Ground Two: Ineffective Assistance of Trial Counsel**

Petitioner asserts that his trial counsel was ineffective for failing to move to suppress Ms. Watley's testimony on the grounds that the testimony was improperly coerced. *See* Pet'r's Br. at 21-22 (citing U.S. Const. amends. VI, XIV).[7] The OCCA rejected this claim on the merits, holding: "Because Watley's testimony was not illegally coerced, defense counsel was not deficient for failing to seek its exclusion on those grounds." OCCA Op. at 5 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)).

---

[7] The record and state-court dockets reflect that Petitioner raised additional claims of ineffective assistance of both trial and appellate counsel in an application for postconviction relief and was denied relief by the trial court. The OCCA declined to exercise jurisdiction over Petitioner's direct appeal of this denial. *See* Pet. at 2-3; *State v. Franklin*, CF-2004-5898 (Okla. Cnty. Dist. Ct. Sept. 16, 2011) (docket entry of order denying application for postconviction relief); *Franklin v. State*, PC-2011-976 (Okla. Crim. App. Nov. 15, 2011) (docket entry of order declining jurisdiction). The OCCA's disposition may have been based upon the untimeliness of Petitioner's commencement of the appeal. *See* Okla. Crim. App. R. 2.1(B) (instructing that the filing of a notice of intent to appeal in the trial court is jurisdictional); *id.* R. 5.2(C)(1) (notice of postconviction appeal must be filed within 10 days of date that denial of relief is filed); *State v. Franklin*, CF-2004-5898 (Okla. Cnty. Dist. Ct. Sept. 28, 2011) (docket entry showing Petitioner's notice of postconviction appeal filed 12 days after denial of application).

Petitioner then filed a second application for postconviction relief, seeking leave to appeal the denial of the first postconviction application out of time; this second application was denied by the trial court on February 9, 2012. The OCCA affirmed this denial on direct appeal. *See State v. Franklin*, CF-2004-5898 (Okla. Cnty. Dist. Ct. Feb. 9, 2012) (docket entry denying second application for postconviction relief and not recommending an appeal out of time); *Franklin v. State*, PC-2012-192 (Okla. Crim. App. June 20, 2012) (order affirming denial); Okla. Crim. App. R. 2.1(E) (instructing that a petitioner wishing to obtain an untimely appeal must file application for postconviction relief in the trial court). Petitioner does not attempt to raise these additional, likely procedurally barred ineffective assistance of counsel claims as grounds for habeas relief in this proceeding. *See* Pet. at 4-5; Pet'r's Br. at 17-38; Pet'r's Mot. to Supp. at 1-4.

Claims of ineffective assistance of counsel in violation of the Sixth Amendment are analyzed under the familiar, two-part test established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668. "First, [Petitioner] must show that counsel's performance was deficient." *See id.* at 687. To satisfy this prong, Petitioner must show that his attorney's performance "fell below an objective standard of reasonableness," or, in other words, that counsel's performance was not "within the range of competence demanded of attorneys in criminal cases." *See id.* at 687-88 (internal quotation marks omitted). There is a strong presumption that counsel acted reasonably, and counsel's performance will not be deemed deficient if it "might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted).

With respect to the second prong of the analysis, Petitioner must show that *but for* counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. *See id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 695.

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.

*Harrington*, 131 S. Ct. at 791-92 (citations and internal quotation marks omitted).

Applying the law as outlined above to the facts of Petitioner's case, Petitioner was not prejudiced by his trial counsel's failure to move for suppression of Ms. Watley's testimony, including her in-court identification of Petitioner as the person who shot Marcus Ivy. As outlined above in Part III.A, there is no contention or indication in the record that Ms. Watley's trial testimony was the product of unduly suggestive police conduct, such that suppression of the testimony would have been warranted under *Brathwaite* and other applicable authority. Petitioner therefore has failed to show that it is "reasonably likely" a request to suppress Ms. Watley's in-court identification of Petitioner would have led to a different result. Therefore, Petitioner cannot show that his trial counsel's performance was prejudicial: there is no "substantial" likelihood of a different result. *See Harrington* , 131 S. Ct. at 791-92; *cf. Jones v. Gibson*, 206 F.3d 946, 959 (10th Cir. 2000) (holding that appellate counsel is not ineffective for failing to raise a meritless claim). Because Petitioner has failed to demonstrate that he was prejudiced by his trial counsel's performance, the undersigned need not address whether counsel's performance was deficient with regard to his suppression efforts. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."). The OCCA's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland*'s governing standard. *See id.* at 687-95; 28 U.S.C. § 2254(d)(1); OCCA Op. at 5. Relief on this basis should be denied.

## C. Ground Three: Sufficiency of the Evidence

Petitioner claims in Ground Three that the evidence admitted at his trial was insufficient for a jury to have found, beyond a reasonable doubt, that he committed the crime of first-degree murder. *See* Pet'r's Br. at 22-26 (citing U.S. Const. amend. XIV). In reviewing a habeas challenge based on the sufficiency of the evidence, a federal court "does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). For habeas review, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The reviewing court considers both direct and circumstantial evidence in determining whether evidence is sufficient to support a conviction. *Lucero v. Kerby*, 133 F.3d 1299, 1312 (10th Cir. 1998). In this habeas matter, the Court "may not weigh conflicting evidence []or consider the credibility of witnesses" but must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." *See id.* (internal quotation marks omitted).

Here, the sufficiency of the evidence inquiry is based on the substantive elements of the crime as defined by Oklahoma law. *See Jackson*, 443 U.S. at 309, 324 n.16. As relevant to this case, the elements of Murder in the First Degree with Malice Aforethought are: (1) the death of a human; (2) that was unlawful; (3) caused by the defendant; and (4) caused with malice aforethought. Okla. Unif. Crim. Jury Instruction

No. 4-61 (2d ed. 1996 & Supps.); Okla. Stat. tit. 21, § 701.7(A); *see* OR 1638 (Jury Instruction No. 23). The jury was specifically instructed: "No person may be convicted of Murder in the First Degree with Malice Aforethought unless his conduct caused the death of the person allegedly killed. A death is caused by the conduct if the conduct is a substantial factor in bringing about the death and the conduct is dangerous and threatens or destroys life." OR 1637 (Jury Instruction No. 22); *see* Okla. Unif. Crim. Jury Instruction No. 4-60.

Petitioner specifically contends that the evidence does not support the perpetrator aspect of the third element—i.e., that Petitioner was the person whose conduct caused the death of Marcus Ivy. According to Petitioner, the State did not establish this element because the conviction was based on the testimony of a single eyewitness, Ms. Watley, and that Ms. Watley's testimony is not worthy of belief. Petitioner argues that "no other evidence links Mr. Franklin to the shooting." *See* Pet'r's Br. at 24-26.

Petitioner raised the same claims of error to support his insufficiency-of-the-evidence argument on direct appeal as those now raised in this habeas action, and the OCCA denied relief on the merits, stating:

> Appellant claims the evidence presented at trial was insufficient to support his conviction. He observes that only Pam Watley claimed to have actually witnessed him committing the crime. He notes facts bearing on Watley's credibility. He points out that there was no physical evidence linking him to the crime. His primary argument is that basing a murder conviction on the word of a single eyewitness violates due process of law. But Appellant's conviction was not based solely on the testimony of Pam Watley. Rashika Williamson's testimony corroborated Watley's account, as did the admissions Appellant made to Kenneth Williams. While there may have been some discrepancies among the accounts of the various witnesses, these were explored in great detail at trial. A rational jury could

19

> have dismissed these discrepancies, and concluded that eyewitness
> testimony and a confession, related by three witnesses who were personally
> acquainted with Appellant, but who had no apparent motive to conspire
> together and falsely accuse him, left no reasonable doubt as to the identity
> of Marcus Ivy's killer. The evidence was sufficient to support the
> conviction.

OCCA Op. at 6 (citing *Jackson*, 443 U.S. at 319; *Easlick v. State*, 90 P.3d 556, 559

(Okla. Crim. App. 2004)); *see also id.* at 1-3 (summarizing evidence presented at trial);

Pet'r's OCCA Br. at 22-26.

Because the OCCA applied the governing standard of *Jackson v. Virginia*, this

Court's task "is limited by AEDPA to inquiring whether the OCCA's application of

*Jackson* was unreasonable" or was contrary to the U.S. Supreme Court's holding in that

case. *See Matthews v. Workman*, 577 F.3d 1175, 1183 (10th Cir. 2009). The OCCA was

not obligated to determine whether it believed the evidence established Petitioner's guilt

beyond a reasonable doubt. *See Jackson*, 443 U.S. at 318. Rather, the relevant question

was "whether, after viewing the evidence in the light most favorable to the prosecution,

*any* rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *Id.* at 319. This standard gives full responsibility to the trier of fact to

"fairly" "resolve conflicts in the testimony, to weigh the evidence, and to draw

reasonable inferences from basic facts to ultimate facts." *Id.*

As indicated by the OCCA's Opinion, there was detailed testimony at trial as to

the events of August 9, 2004, at the Will Rogers Courts. Pamela Watley testified that in

August 2004 she had been living in the Will Rogers Courts for nine years and that she

had known Petitioner for about four years. Vol. IV Trial Tr. 231-33.[8] Ms. Watley also knew Marcus Ivy as her neighbor who lived across the courtyard from her with his brother, Kiki. Vol. IV Trial Tr. 233-34. On the morning of August 9, 2004, Ms. Watley's mother brought Ms. Watley's two daughters to visit her at the Will Rogers Courts. Vol. IV Trial Tr. 236. Ms. Watley testified that she saw Petitioner in her apartment complex once or twice a week and that she saw him at the Will Rogers Courts on that date. Vol. IV Trial Tr. 238. Petitioner was driving his black Cadillac when Ms. Watley first saw him. Vol. IV Tr. 238, 245-46. Ms. Watley tried to flag Petitioner down as he was driving on Pettee Street between noon and 1:00 p.m., but Petitioner did not stop. Instead, Petitioner "said shh" to Ms. Watley and continued driving. Vol. V Trial Tr. 41-43.

When Ms. Watley next saw Petitioner, Petitioner was on foot across from her apartment. Vol. V Trial Tr. 43-44. Ms. Watley testified Petitioner was on the side of the building containing Marcus Ivy's apartment (#1628) beside a bush. Petitioner signed for Ms. Watley to keep quiet by putting his finger up to his mouth. Vol. V Trial Tr. 43-45, 79. Petitioner walked toward Marcus Ivy's apartment, and Ms. Watley turned to go back to her apartment. Marcus Ivy, who was sweeping his porch, asked Ms. Watley for some bleach. Vol. V Trial Tr. 46. Ms. Watley told Marcus Ivy to "hold on" and then asked her

---

[8] Although not explained in her answer, it is clear from the context of the questioning that Ms. Watley meant that she had known Petitioner for about four years in August 2004, not that she had known him for four years as of December 2008. *See* Vol. IV Trial Tr. 232-33. Petitioner does not dispute that Ms. Watley knew him prior to the shooting of Marcus Ivy. *See* Pet'r's Br. at 12-13, 24-25, 31.

daughter to get some bleach. After Ms. Watley got the bleach and was walking toward Marcus Ivy's apartment, she saw Petitioner on the porch with Marcus Ivy. Vol. V Trial Tr. 46-47. Marcus Ivy was facing his front door and had his back turned toward Ms. Watley. Vol. V Trial Tr. 46, 79-80. Ms. Watley heard Petitioner say, "[N]ow, nigger; now, nigger, I got you" and heard at least three shots. Vol. V Trial Tr. 82-83, 84. Ms. Watley saw Petitioner shoot Marcus Ivy and then saw Marcus Ivy fall to the ground. Vol. V Trial Tr. 48, 83.

Ms. Watley then saw Petitioner take a gun out of Marcus Ivy's pocket and run inside Marcus Ivy's apartment. Vol. V Trial Tr. 85-87. Petitioner then came out of the apartment carrying a VCR and "disappeared." Vol. V Trial Tr. 86, 88. Ms. Watley testified that she ran back inside her apartment and lay on the floor with her mother and daughters. Then Ms. Watley and her family ran out of the back door of her apartment to a friend's house. Vol. V. Trial Tr. 89-90.

Ms. Watley testified that on the date of the shooting, Ms. Watley did not call the police and also denied having seen anything because she did not want to be a "snitch." Vol. V Trial Tr. 49-50. Several days later, Ms. Watley again denied knowing anything to the police because she was afraid of Petitioner. Vol. V Trial Tr. 50-51. Ms. Watley testified that she later told other people that she had seen Petitioner shoot Marcus Ivy. Vol. V Trial Tr. 90-91, 123-24, 126. Ms. Watley testified that after she was served with the Subpoena, she initially did not tell police she saw Petitioner shoot Marcus Ivy, but later Ms. Watley decided it was time to tell police the truth about what she saw and told police she had seen Petitioner shoot Marcus Ivy. Vol. V Trial Tr. 93; *see also* OR 8. As

discussed above, Ms. Watley identified Petitioner in person during the trial.  Vol. IV Trial Tr. 232-33.

Rashika Williamson testified she was living at the Will Rogers Courts apartments in August 2004.  Ms. Williamson was good friends with Marcus Ivy, and she had grown up with Petitioner, who also was her friend.  Vol. VI Trial Tr. 13-14.  Ms. Williamson identified Petitioner in person at trial.  Vol. VI Trial Tr. 14-15.  Ms. Williamson testified that around noon on August 9, 2004, she was in her living room and heard a gunshot. Ms. Williamson testified that she looked out the window and saw a person she thought was Petitioner running away; Petitioner had an item in his hand that Ms. Williamson thought was a gun.  Vol. VI Trial Tr. 15-16.  Ms. Williamson testified that she saw Marcus Ivy running to an apartment holding his stomach and stumbling.  Vol. VI Trial Tr. 18-19.

Kenneth Williams testified he had known Petitioner for six or seven years and they had been friends with each other "off and [o]n"; Mr. Williams identified Petitioner in person during the trial.  Vol. VI Trial Tr. 173-74.  Mr. Williams testified that a few days after Marcus Ivy was shot, Petitioner called Mr. Williams on the phone and told him about shooting Marcus Ivy.  According to Mr. Williams, Petitioner told Mr. Williams that when Petitioner was in Will Rogers Courts and saw Marcus Ivy, Petitioner "walked up on him, grabbed Marcus' gun and he had a gun and he shot Marcus."  Vol. VI Trial Tr. 175. Mr. Williams testified that Petitioner told him that Marcus Ivy was sweeping his porch when Petitioner shot him.  Vol. VI Trial Tr. 175-76.  Mr. Williams testified that

Petitioner told him that Petitioner and Marcus Ivy had some type of confrontation at Will Rogers Courts about two days before the shooting. Vol. VI Trial Tr. 176-77.

Sergeant Cliff Mueggenborg, an investigator for the crime scene unit of the OCPD in August 2004, testified that he collected metal fragments from the porch of Apartment 1628, one of which was later identified by OCPD firearms examiner Ronald Jones as a fragment of a bullet jacket, most probably fired from a .38 Special or .357 Magnum firearm. Vol. VI Trial Tr. 52, 73, 75-76, 79-81, 153-54, 157-58, 160-63; State's Exs. 13, 63 (Doc. No. 15). Sergeant Mueggenborg testified he observed what appeared to be bloodstains on the door of Apartment 1628 and that he swabbed those stains to obtain physical evidence. Vol. VI Trial Tr. 55, 77-78, 87-89; State's Exs. 23, 77. Sergeant Mueggenborg further testified that he had observed and marked what appeared to be a blood trail from Apartment 1628 to Apartment 1642. Vol. VI Trial Tr. 88-93. He collected State's Exhibits 2A and 2B (shoes with apparent bloodstains), 2C (pants with apparent bloodstains), and 3 (towel with apparent bloodstains) from the porch of Apartment 1642. Vol. VI Trial Tr. 94, 97-98; State's Exs. 2A, 2B, 2C, 3, 86, 88, 90. OCPD Officer Edward Mosier testified that he was the first police officer to arrive at the scene on August 9, 2004, and that he observed Marcus Ivy lying on his stomach just inside the back door of Apartment 1642. Vol. VI Trial Tr. 247-48, 250-51. Dr. Chai Choi, a forensic pathologist employed by the Office of the Chief Medical Examiner for the State of Oklahoma, testified that Marcus Ivy sustained a single gunshot wound to the right epigastrium area (depicted on State's Exhibits 94 and 95) going through to the right lower back (depicted on State's Exhibit 94). Vol. VI Trial Tr. 5, 7-8, 15, 17-21; State's

Exs. 94, 95. Dr. Choi testified that Marcus Ivy died from the gunshot wound resulting in multiorgan failure and that the manner of his death was homicide. Vol. VI Trial Tr. 21-25.

In light of this evidence, Petitioner's argument that his conviction is improperly based only upon the testimony of a single eyewitness is not supported by the record. Petitioner attacks Ms. Watley's testimony implicating Petitioner as "not worthy of belief" due to: use of the Subpoena and material-witness warrants; Ms. Watley's mental status and drug use at the time of the shooting; and inconsistencies between Ms. Watley's testimony and that of other witnesses. *See* Pet'r's Br. at 24-6; *see, e.g.*, Vol. IV Trial Tr. 221-23 (Ms. Watley's mother testifying that Ms. Watley had gotten "pretty messed up on drugs" during the day of August 9, 2004); Vol. V Trial Tr. 106, 109, 127 (Ms. Watley testifying that she had had not slept for two days and had been up using crack cocaine prior to the shooting). When a record supports conflicting inferences, however, the Court must presume that the jury "resolved any such conflicts in favor of the prosecution." *See Matthews*, 577 F.3d at 1184 (internal quotation marks omitted). The Court is "not allowed to weigh conflicting evidence or consider the credibility of witnesses" on habeas review. *See id.* (internal quotation marks omitted). Here, the jury was permitted to evaluate all of the above testimony, including as to Ms. Watley's physical state and use of drugs, and was able to determine the weight to give to Ms. Watley's testimony and to evaluate any inconsistencies with other witnesses' accounts. "[T]he jury was entitled to find her identification testimony at trial to be credible, particularly in light of the fear and trauma that she may have experienced in the period immediately following the murders."

*Torres v. Mullin*, 317 F.3d 1145, 1157 (10th Cir. 2003) (rejecting habeas challenge to sufficiency of the evidence where eyewitness had failed to identify defendants when first interrogated).

The jury was specifically and properly instructed that a necessary element of the relevant offense is that the death must be "caused" "by the conduct" of Petitioner and was specifically and properly instructed on the meaning of these terms under Oklahoma law. *See* OR 1637, 1638 (Jury Instruction Nos. 22, 23); Okla. Crim. Jury Instruction Nos. 4-60, 4-61; Okla. Stat. tit. 21, § 701.7(A). In a federal habeas challenge to the sufficiency of the evidence, "[s]tate law determines the parameters of the offense and its elements and a federal court may not reinterpret state law." *Tillman v. Cook*, 215 F.3d 1116, 1131-32 (10th Cir. 2000) (internal quotation marks omitted). Considering the testimony and evidence discussed above, a rational trier of fact could find beyond a reasonable doubt that Petitioner was the perpetrator of conduct that caused the unlawful death of Marcus Ivy. Therefore, the OCCA's rejection of Petitioner's challenge to the sufficiency of the evidence was not contrary to or an unreasonable application of the governing *Jackson* standard. *See* OCCA Op. at 6; 28 U.S.C. § 2254(d)(1); *Jackson*, 443 U.S. at 319. Petitioner is not entitled to habeas relief on Ground Three.

### D. Ground Four: Trial Court's Failure to Declare a Mistrial

Petitioner next seeks habeas relief on the basis that he was denied his right to a fair trial when the trial court refused to declare a mistrial based upon verbal references to Petitioner's "background" and "other cases." Pet'r's Br. at 26-29.

Regarding the "other cases" statement, in the instant case, during voir dire, a certain "Panelist L." was called as a prospective juror and asked by the trial court if she thought she knew anything about the case. Panelist L. responded, "I don't know anything about this case, but I know about other cases." Vol. II Trial Tr. 116. The trial court stated: "Okay. Other cases involving where you have been involved in or?" Amidst interjections from the court and defense counsel, Panelist L. answered, "Involving—," "Involving people that—," and "Prior history of—." Vol. II Trial Tr. 116-17. The trial court responded, "Knowledge with the District Attorney's office? Okay. Come on up." Vol. II Trial Tr. 117.

The trial court then excused the pool of jurors from the courtroom and questioned Panelist L. in chambers with all counsel present. Panelist L. advised the court that she thought she had seen Petitioner on the local news and, based on what she had seen on the news, she thought that Petitioner had a "huge rap sheet," was a gang member and a repeat offender, and was involved with drugs and several other murder charges. Vol. II Trial Tr. 118-21. Panelist L. stated that her understanding would "taint" her opinion and was excused. Vol. II Trial Tr. 121. Petitioner's attorney moved for a mistrial, arguing that there now was "a bell that can't be unrung, no matter how you admonish the jury"; the trial court denied the motion, ruling that Panelist L. had made no statement connecting Petitioner with the things she had talked about. Vol. II Trial Tr. 122-25. Defense counsel declined to state a position on whether he would request an admonishment to the jury regarding Panelist L.'s comments. Vol. II Trial Tr. 126-30, 131. The trial court stated

that "it doesn't find that the statement . . . created cause for a mistrial." Vol. II Trial Tr. 131.

Panelist L. was interviewed by the trial court and by the attorneys in chambers regarding whether she had shared her thoughts about Petitioner to anyone else in the prospective jury or in the courthouse jury pool, and Panelist L. answered that had not. Vol. II Trial Tr. 136-39. Panelist L. was excused for cause. Vol. II Trial Tr. 139. Defense counsel reurged his request for a mistrial, or alternatively for an entirely new jury panel or individual sequestered voir dire, but refused to answer whether he wished for the jury to receive an admonishment. Vol. II Trial Tr. 140-49; OR 1585-88. The trial court denied defense counsel's requests and admonished the remaining prospective jurors that Panelist L. "had some beliefs based totally on speculations" and that the jurors were to "disregard any comments that she had to say in open court." Vol. II Trial Tr. 149-50.

With respect to the "background" statement, during Pamela Watley's cross-examination the prosecutor asked Ms. Watley if she felt afraid of Petitioner in the hours and days following the shooting. Vol. V Trial Tr. 50-51. Ms. Watley replied, "Yes, I was afraid of Mr. Franklin because of his background." Vol. V Trial Tr. 51. Defense counsel objected and moved again for a mistrial, on the grounds of Ms. Watley's improper mention of Petitioner's background in front of the jury. Vol. V Trial Tr. 51-60, 61-64; *see* Okla. Stat. tit. 12, § 2404(B) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."). The trial court denied the motion, determining that Ms. Watley's "statement and use of the word 'background' clearly does not speak as to prior convictions, prior . . .

cases, but it is an example of other evidence of the defendant's bad character." Vol. V

Trial Tr. 67-68. The trial court admonished the jury to disregard Ms. Watley's "comment

about a background." Vol. V Trial Tr. 74.

The OCCA discussed Petitioner's contentions in detail and rejected his claim of

error. Regarding Panelist L's comments, the OCCA held:

> The decision to grant a mistrial is generally left to the sound
> discretion of the trial court. The mere suggestion of another crime
> allegedly committed by the accused is not usually reversible error.
> Appellant complains that Panelist L.'s comment was a clear reference to
> other crimes committed by him, and that by admonishing the rest of the
> panel, the court only brought more attention to the implication that
> Appellant had been in trouble before. We disagree. The trial court made
> an ample record on the matter, and conscientiously considered the
> arguments of counsel before making its ruling. The record supports the
> conclusion that the panelist's reference to "other cases" (which did not
> specify who was involved in those cases, or what those cases were about)
> did not taint the panel with insinuations about Appellant's criminal history.
> The trial court's decision to deny a mistrial, but to admonish the panel in an
> abundance of caution, was not an abuse of discretion.

OCCA Op. at 7-8 (citations omitted).

Regarding Ms. Watley's reference to Petitioner's "background," the OCCA held:

> The prosecutor asked Watley [why she was reluctant to testify and
> implicate Petitioner in the murder], not to delve into Appellant's past, but to
> get Watley to relate an incident that had occurred in the jail just the day
> before. Watley went on to state that a few days before, as she passed by
> Appellant in the county jail (where she also was being held as a material
> witness pending completion of testimony), he told her that regardless of the
> outcome of his trial, "we will take care of you." Watley testified that she
> perceived this as a threat, not as a promise of beneficence. This comment,
> of course, was entirely admissible against Appellant, and he does not
> complain about it on appeal. Whatever vague implications about other
> crimes might be found in Watley's reference to Appellant's "background"
> were overshadowed by the properly-admitted evidence. The trial court did
> not abuse its discretion in how it resolved this matter.

OCCA Op. at 8-9 (footnote omitted).[9]

Respondent broadly asserts that Ground Four (as well as Ground Five, discussed *infra* Part III.E) "involve[s] matters of state law" and therefore the Court should "decline to entertain" these arguments. Resp't's Resp. at 23. This response fails to recognize that Petitioner specifically argues, as he also did to the OCCA, that his right to an impartial jury under the Sixth and Fourteenth Amendments was violated, which is a specific claim of "violation of the Constitution" long recognized in federal habeas actions. *See* Pet'r's Br. at 28; OCCA Br. at 28; 28 U.S.C. § 2254(a); *see, e.g.*, *Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961); *Lucero*, 133 F.3d at 1307-09. The undersigned thus concludes that Petitioner raises cognizable (though ultimately meritless) federal habeas claims in Grounds Four and Five and analyzes the OCCA decision thereon with the deference mandated by AEDPA.

Here, the focus of the inquiry is not whether the trial court abused its discretion under Oklahoma law but whether denial of a mistrial resulted in a deprivation of Petitioner's federal constitutional right to a fair trial before an impartial jury. "The Sixth Amendment, applied to the states by the Fourteenth Amendment, ensures that '[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . trial . . . by an impartial jury of the State and district wherein the crime shall have been committed.'" *Gardner v.*

---

[9] Even if disagreement could be had with the OCCA's view of the purpose of the State's question, what matters is the potential effect of Ms. Watley's answer on the jury. Room for disagreement on the former point does not undermine the OCCA's conclusion on the latter.

*Galetka*, 568 F.3d 862, 888 (10th Cir. 2009) (alteration in original) (quoting U.S. Const. amend. VI).

> It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 722-23.

To obtain habeas relief, Petitioner must show that the trial court's refusal to grant a mistrial based upon juror bias deprived Petitioner of a fair and impartial jury. *See Gardner*, 568 F.3d at 887-90 (rejecting habeas claim of juror bias based upon pretrial publicity); *Sallahdin v. Gibson*, 275 F.3d 1211, 1222-23 (10th Cir. 2002) (rejecting habeas claim of juror bias where trial court had refused to reopen voir dire and refused to remove juror for cause). To show juror bias, Petitioner "must show more than that the juror[s] had a preconceived notion of guilt; he must show that the juror[s] had such a fixed opinion that [they] could not judge impartially." *Hale v. Gibson*, 227 F.3d 1298, 1320 (10th Cir. 2000). Due to the "broad deference traditionally accorded to trial courts in determining jury selection procedures and conducting voir dire," a petitioner must show that the trial court committed "manifest error" in finding that the jury as a whole

was impartial. *Lucero*, 133 F.3d at 1308 (internal quotation marks omitted).[10] To make this showing, a petitioner must demonstrate either actual prejudice or that "the trial gave rise to a presumption of prejudice because it involved such a probability that prejudice will result that it is deemed inherently lacking in due process." *Id.* (internal quotation marks omitted).

The trial court's decision to deny a mistrial following each communication was reached only after individualized consideration of defense counsel's arguments and was premised upon an express or implied finding that the disputed comments were not sufficient cause to declare a mistrial based on an impartial jury. *See* Vol. II Trial Tr. 117-35, 136-49; Vol. V Trial Tr. 51-60, 61-64, 67-68; *cf. Goss*, 439 F.3d at 627 ("[A] state trial court's finding regarding the impartiality of particular jurors is a question of fact."). Pursuant to AEDPA, Petitioner carries the burden of rebutting the presumption of correctness of a state court's factual determinations by clear and convincing evidence. *See Goss*, 439 F.3d at 627; 28 U.S.C. § 2254(e)(1); *Morris v. Workman,* No. CIV-09-81-

_____

[10] In *Gardner*, the Tenth Circuit stated:

This court's precedents are not entirely consistent with regard to the standard of review to apply to a state court's decision regarding jury impartiality. *Compare Goss v. Nelson*, 439 F.3d 621, 627 (10th Cir.2006) (stating that only when a manifest error occurs can a federal habeas court overturn a state court's finding regarding jury impartiality as a whole), *with Hale*[, 227 F.3d at 1331] (asking whether state supreme court's finding that trial court did not abuse its discretion in rejecting change of venue was an unreasonable application of Supreme Court precedent).

568 F.3d at 888 (citation omitted). As outlined herein, the undersigned has considered the governing authorities and concludes that "the same result would follow from either standard"; thus, as in *Gardner*, any inconsistency need not be resolved here. *See Gardner*, 568 F.3d at 888.

R, 2009 WL 2579792, at *6-10 (W.D. Okla. Aug. 18, 2009) (denying habeas relief where trial court refused to grant a mistrial and defense counsel pointed only to "apprehension" and "appearance" rather than facts to support a conclusion that the jury was impartial), *appeal dismissed*, 382 F. App'x 693 (10th Cir. 2010).

Petitioner has not identified any actual bias on the part of any particular juror. Rather, Petitioner suggests that prejudice should be presumed because the jury heard Panelist L.'s statement regarding "other cases" and Ms. Watley's testimony regarding "background." *See* Pet'r's Br. at 28-29; *cf.* Vol. IV Trial Tr. 85 (defense counsel renewing his motion for mistrial due to a "tainted jury" but agreeing that he had no individual challenge to the jurors who were passed for cause). Petitioner also contends that the trial judge's issuance of a cautionary instruction following each of these communications only served "to draw more attention to them." *See* Pet'r's Br. at 27-28.

Petitioner has failed to establish a presumption of prejudice under the facts of this case. "A presumption of prejudice . . . attends only the extreme case." *Skilling v. United States*, 561 U.S. 358, 381 (2010). Panelist L. was interviewed by both attorneys and by the court and excused for cause; she did not sit on the jury. While Panelist L's comments in closed chambers revealed that Panelist believed she knew information about Petitioner's past, Panelist L's "other cases" comment was nonspecific and did not actually implicate Petitioner in any other crimes or acts. Similarly, Ms. Watley's bare reference to "background" did not reasonably communicate to the jury that Petitioner had committed other crimes or specific instances of bad activity. Panelist L. communicated that she had not shared her thoughts on Petitioner's past with any jurors, and she was

removed from the prospective-juror pool after she made the "other cases" comment. The trial court, with the participation of both parties' counsel, engaged in more than three days of voir dire proceedings in an effort to seat jurors who "indicated that they could remain fair and impartial." *See Lucero*, 133 F.3d at 1309; Vol. I Trial Tr. 10-240; Vol. II Trial Tr. 5-299; Vol. III Trial Tr. 3-223; Vol. IV Trial Tr. 4-142.

Further, despite defense counsel's ambivalence regarding jury admonishments, the jury was specifically instructed to disregard both of the disputed comments, and such instructions have been found to be ameliorative of purported errors that potentially render a criminal trial unfair. *See, e.g.*, *Brown v. Sirmons*, 515 F.3d 1072, 1084 (10th Cir. 2008); *Bland v. Sirmons*, 459 F.3d 999, 1022-23 (10th Cir. 2006); *cf. Lucero*, 133 F.3d at 1308-09 (finding no presumption of prejudice despite petitioner's contention that questioning of jurors regarding their association with the victim's sister, who had been seated as a prospective juror, "only served to emphasize the situation"). "Absent evidence to contrary, we presume that jurors remain true to their oath and conscientiously observe the instructions and admonitions of the court." *Lucero*, 133 F.3d at 1309 (internal quotation marks omitted); *cf. United States v. Small*, 423 F.3d 1164, 1178-80 (10th Cir. 2005) (affirming decision of trial court denying mistrial after potential juror expressed concern for personal safety because case involved drugs and seven defendants and ten marshals were present: "Any prejudice that may have resulted . . . was adequately addressed by the district court's explanation of the presence of the marshals in the courtroom.").

The two isolated incidents, occurring in the course of seven days of "a fairly structured and formal setting," are insufficient to establish a presumption of prejudice. *See Lucero*, 133 F.3d at 1309; 28 U.S.C. § 2254(e)(1). Petitioner has not shown manifest error in the trial court's denial of a mistrial or rebutted the presumption of correctness in the trial court's findings. *See id.* The OCCA's rejection of relief on the merits was not an unreasonable application of or contrary to clearly established federal law; nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. §§ 2254(d)(1)-(2). Relief should be denied on Ground Four.

### E. Ground Five: Trial Court's Failure to Give Eyewitness Identification Instruction

In Ground Five, Petitioner asserts that he was deprived of a fair trial because the trial court refused to specifically instruct the jury as to factors relevant for consideration of eyewitness testimony. *See* Pet'r's Br. at 29-32. At trial, Petitioner's counsel submitted a proposed jury instruction, based upon an Oklahoma uniform criminal instruction, containing cautionary language as to eyewitness identification testimony (the "Eyewitness Instruction"). Vol. VII Trial Tr. 3-4; *see* Okla. Unif. Crim. Jury Instruction No. 9-19. After the State raised its objection, the trial court heard argument from both parties' counsel, discussed the proposed instruction in detail, and ruled that the Eyewitness Instruction would not be given. Vol. VII Trial Tr. 3-9.

Petitioner argues that he was entitled to the Eyewitness Instruction based upon the lack of reliability of Pamela Watley's eyewitness identification of Petitioner, and to a

lesser extent the lack of reliability of Rashika Williamson's eyewitness identification of Petitioner. According to Petitioner, the case "hinged on" these two eyewitnesses' testimony, but that testimony was undermined by the inconsistencies in Ms. Watley's statements and also the inconsistencies between those statements and the testimony of Ms. Williamson and Mr. Williams. *See* Pet'r's Br. at 30-32. The OCCA denied Petitioner's challenge to the trial court's decision on direct appeal:

> Appellant contends that the trial court erred in refusing to instruct the jury on the special dangers of eyewitness identification. The trial court carefully considered the propriety of this instruction, evaluating each of the factors suggested in OUJI-CR (2nd) No. 9-19. The court agreed that eyewitness identification was a central issue in the case, but observed that the identifications were made by persons well acquainted with Appellant. The key witnesses may have had some credibility issues, but the ability to see and recognize those involved in the crime was not one of them. The trial court did not abuse its discretion in refusing to specially caution the jury on eyewitness identification.

OCCA Op. at 9 (citation omitted).

"A state conviction may only be set aside in a habeas proceeding on the basis of erroneous jury instructions when the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial." *Maes v. Thomas*, 46 F.3d 979, 984 (10th Cir. 1995). The issue is "not whether the instruction is undesirable, erroneous, or even universally condemned, but whether the instruction so infected the trial that the resulting conviction violates due process." *Id.* (internal quotation marks omitted); *accord Robison*, 232 F. App'x 785, 789 (10th Cir. 2007). In this case, Petitioner has not shown that the trial court's failure to specially instruct on eyewitness identification resulted in a fundamentally unfair trial.

While the trial court did not give the specific instruction requested by Petitioner, (1) the court did instruct the jury that in determining the weight or credibility to be given the testimony of each witness, the jury may properly consider "the ability of the witness to remember and relate past occurrences, the means of observation, and the opportunity of knowing the matters about which the witness has testified." OR 1627 (Jury Instruction No. 13). In addition, (2) defense counsel had ample opportunity to cross-examine and discredit the witnesses regarding their identification of Petitioner, and (3) "the prosecution's case did not rest solely on eyewitness testimony." *See Robison*, 232 F. App'x at 791; Vol. V Trial Tr. 103-67, 177-78; Vol. VI Trial Tr. 22-49, 50-51; *supra* Part III.C. In *Robison*, the Tenth Circuit relied on these same three factors to reject an ineffective assistance of counsel habeas claim premised upon the defense attorney's failure to request a cautionary instruction regarding eyewitness testimony. *See Robison*, 232 F. App'x at 791.

The committee notes accompanying Oklahoma Uniform Criminal Jury Instruction No. 9-19 prescribe that the instruction should be given if "there is a serious question concerning the reliability of the identification." Okla. Unif. Crim. Jury Instruction No. 9-19 note. The trial court addressed the factors that the jury would be asked to consider if given the proposed instruction and reasonably concluded that Ms. Watley's testimony had remained positive following cross-examination. Vol. VII Trial Tr. 9. The eyewitnesses did not vacillate on their respective identifications of Petitioner as being present at Will Rogers Courts in their trial testimony. *See* Vol. IV Trial Tr. 232-33, 238; Vol. V Trial Tr. 40; Vol. VI Trial Tr. 14-15, 23; *cf. United States v. Thoma*, 713 F.2d

604, 608 (10th Cir. 1983) ("[T]he government's case did not depend upon a single eyewitness, but upon several witnesses whose identifications were not shaken despite some uncertainties and disparities in their testimony . . . ."). In *Thoma*, the Tenth Circuit relied upon witnesses' unwavering identifications in finding that the failure to give a cautionary eyewitness instruction was not reversible error on direct appeal. *See Thoma*, 713 F.2d at 608. *But cf. Perry*, 132 S. Ct. at 730 (listing a given jury instruction on identification testimony as one of the safeguards defeating a claim of deprivation of due process).

Here, the OCCA similarly and reasonably concluded that the key witnesses' "ability to see and recognize those involved in the crime" was not a significant credibility issue. *See* OCCA Op. at 9. Further, it is undisputed that both Ms. Watley and Ms. Williamson knew Petitioner by sight prior to the events of August 9, 2004. *Cf. Brathwaite*, 432 U.S. at 112 (noting that "the problems of eyewitness identification" are that "[u]sually the witness must testify about an encounter with a total stranger under circumstances of emergency or emotional stress" and that "[t]he witness'[s] recollection of the stranger can be distorted easily by the circumstances or by later actions of the police"). For all of these reasons, the trial court's failure to give the proposed Eyewitness Instruction did not render the trial "so fundamentally unfair as to cause a denial of a fair trial." *See Maes*, 46 F.3d at 984. The OCCA's decision in this regard was not contrary to or an unreasonable application of clearly established federal law. Petitioner is not entitled to habeas relief on Ground Five.

**F.  Ground Six: Violation of Equal Protection and *Batson v. Kentucky***

In Ground Six, Petitioner claims that the State used peremptory challenges to exclude two potential jurors on the basis of race, in violation of his equal protection rights as determined by the United States Supreme Court in *Batson v. Kentucky*, 476 U.S. 79 (1986).  *See* Pet'r's Br. at 33-37 (citing U.S. Const. amend. XIV).

As the Tenth Circuit has explained:

> The Constitution forbids a prosecutor from exercising a peremptory challenge to a prospective juror on account of the juror's race.  When defense counsel believes that the prosecutor has violated *Batson*, a three-step review process is in order.  Once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two).  If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.  At the second step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.  But if, at step three, the court finds the proffered ground to be pretextual, it may determine that the strike was purposeful discrimination.

*Black v. Workman*, 682 F.3d 880, 894 (10th Cir. 2012) (alterations, citations, and internal quotation marks omitted).

Pursuant to AEDPA and Tenth Circuit authority, Petitioner is only entitled to relief on his *Batson* claim if the OCCA's determination was "'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'  28 U.S.C. § 2254(d)(2)."  *Id.* at 896 (quoting *Rice v. Collins*, 546 U.S. 333, 338 (2006)).  "Thus, a federal habeas court can only grant [Petitioner's] petition if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson*

challenge. State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *See Rice*, 546 U.S. at 338-39; *Black*, 682 F.3d at 896; 28 U.S.C. § 2254(e)(1).

     *1.   Challenges to Panelist J and Panelist M*

     The prosecution exercised its sixth peremptory challenge to excuse "Panelist J." This dialogue followed:

> THE COURT: [Panelist J.], Number 1.
>
> [DEFENSE COUNSEL]: I need to object as to *Batson*. And let the record reflect that is the only African-American person in this jury person of 30. And I object to her being excused and I request a race-neutral reason.
>
> . . . .
>
> [PROSECUTOR]: First and foremost, because you will require us to come up with people to kick, I don't know that I would necessarily kick everyone that I'm kicking, but you are making us do nine. So the biggest reason is she has got two children, one who is only three months old and she is unemployed. That is the biggest reason. Also, she is exactly the same age as Mr. Franklin. And the last question [defense counsel] asked her was about her ability to stick to her guns and she was, in my opinion, very firm in the response that, yeah, I will stick to my guns no matter what. And you need to be able to deliberate.
>
> . . . .
>
> [DEFENSE COUNSEL]: Okay. This particular person, [Panelist J.], is like I said, the only African-American person out of the 30 people seated here today. Additionally, Judge, [Panelist J.] is not the only person with two children around that age group. There are other jurors who are not African-American who have the same situation in that regard. There are other jurors the same age as Mr. Franklin. And every juror I asked that question to was as fair, if you remember, as [Panelist J.] was. I would object to that excusal.
>
> THE COURT: It will be so noted. The Court finds that the State is exercising their peremptories based on non-racial factors. . . . .
>
> . . . .
>
> [PROSECUTOR]: Can I also add, while we are talking about this, I don't think the record has been clear that there have been I don't know how many

other African-Americans who came to the pool and were excused for cause because of their views on the death penalty.

THE COURT: Their inability to follow the law.

Vol. IV Trial Tr. 90-91; *see also* Vol. I Trial Tr. 177-78, 194; Vol. II Trial Tr. 14-26

The prosecution exercised its eighth peremptory challenge to excuse "Panelist M."

This dialogue followed:

[DEFENSE COUNSEL]: Your Honor, there is now a pattern. This is the second minority which the State has excused with their peremptory challenge. [Panelist M.] is a Mexican American. And based upon that I request a race neutral reason.

. . . .

[PROSECUTOR]: Well, Number one, we are forced to excuse people. He has got a brother-in-law facing a capital murder offense right now he said. And I think also he has a difficulty understanding the concepts that we have talked about.

THE COURT: Okay.

. . . .

[DEFENSE COUNSEL]: . . . . However, he is the only other minority on this jury panel and I do object, Judge.

THE COURT: Okay.

[PROSECUTOR]: There is one other thing. He also indicated that he thought that people of color and Hispanic were discriminated against by the Government, by the law enforcement agencies.

THE COURT: The State has stated a sufficient race neutral reason. I don't find a pattern for excusal.

Vol. IV Trial Tr. 92-93; *see also* Vol. I Trial Tr. 152-53, 186; Vol. III Trial Tr. 53-61.

## 2. *Fourteenth Amendment Analysis*

With respect to both Panelist J and Panelist M, the trial court directed the State to

explain its rationale for the peremptory strike, and the prosecutor offered an explanation.

Accordingly, the undersigned assumes that the trial court found a prima facie case at step

one of the *Batson* inquiry and proceeded to step two: whether the prosecutor offered a

race-neutral explanation for each peremptory strike. *See Saiz v. Ortiz*, 392 F.3d 1166, 1178-79 (10th Cir. 2004). Petitioner asserts that the prosecutor's stated reasons for exercising the two peremptory challenges were not actually race-neutral, but merely a pretext for discriminatory strikes. *See* Pet'r's Br. at 35. The record supports a finding that these proffered reasons were *not* pretextual.

During voir dire, Panelist J. indicated that she had not thought at all about the issue of the death penalty since the day before, despite significant discussion about the issue during the preceding day's proceedings, because she was "pretty firm" in the way she believed or in her ability to be a juror. Vol. II Trial Tr. 14-15. A juror's disfavor of or opposition to the death penalty has been held to be a nonpretextual, race-neutral explanation on a *Batson* challenge. *See Sallahdin*, 275 F.3d at 1225-26 (citing *United States v. Barnette*, 211 F.3d 803, 812 (4th Cir. 2000); *United States v. Moore*, 149 F.3d 773, 780 (8th Cir. 1998)). This explanation, as well as Panelist J.'s age, family, and employment circumstances, was "a neutral explanation related to the particular case to be tried," in light of the State's intent to seek the death penalty upon issuance of a guilty verdict. *See Batson*, 476 U.S. at 98; Vol. I Trial Tr. 177-78, 194 (Panelist J. stating that she is a 30-year-old, single, unemployed mother of two); Vol. II Trial Tr. 14-26; Vol. IV Trial Tr. 90-91; OR 64-65, 68-69.

In response to questions regarding his opinions on the death penalty, Panelist M. stated his belief that some members of his race have been "[d]iscriminated against" and that some stories he has heard are "unfair." Vol. III Trial Tr. 54-56. Although Petitioner claims that the State's reliance upon this belief was not race-neutral, in the *Batson*

context, "[a] neutral explanation means an explanation based on something besides the race of the *juror*." *Saiz*, 392 F.3d at 79 (emphasis added) (internal quotation marks omitted). Courts have rejected the argument that discriminatory intent is inherent in an explanation relying upon a prospective juror's negative experience with, and perspective of, law enforcement based on presumed racial profiling or race bias. *See, e.g.*, *Boggs v. Diguglielmo*, 264 F. App'x 165, 169 & n.6 (3d Cir. 2008) (holding that prosecutor satisfied *Batson*'s second prong when race-neutral reasons offered by prosecutor to exclude African-American venireperson included juror's concern about police bias in treatment of African-Americans); *Green v. Travis*, 414 F.3d 288, 300 (2d Cir. 2005) ("[A] juror's perceived bias against law enforcement can constitute a race-neutral explanation for a peremptory challenge."). Petitioner does not dispute that Panelist M. reported having a brother-in-law being held in jail on murder charges in Oklahoma County, ostensibly being prosecuted by the District Attorney's Office (as was Petitioner in the instant case). *See* Vol. I Trial Tr. 152-53. Further, when asked whether he could fairly hear this case on the issues of guilt and punishment, Panelist M. misstated the applicable burden of proof. *See* Vol. III Trial Tr. 58 (Panelist M. stating that "in a way it's not our burden to carry with us because the defense don't prove their case or don't do their job then—").

The second step of the *Batson* inquiry "'does not demand an explanation that is persuasive, or even plausible.'" *Saiz*, 392 F.3d at 1179 (citing *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995)). Rather, "'the issue is the facial validity of the prosecutor's explanation,'" so "[u]nless a discriminatory intent is inherent in the prosecutor's

explanation, the reason offered will be deemed race neutral.'" *Id.* (alteration in original) (quoting *Purkett*, 514 U.S. at 768). The reasons cited by the State are facially valid, reflect no discriminatory intent, and support the trial court's specific findings to that effect. *See* Vol. IV Trial Tr. 90-91, 92-93. Petitioner has failed to show the trial court's findings at step two were unreasonable or to rebut those findings by clear and convincing evidence. *See Rice*, 546 U.S. at 338-39; *Black*, 682 F.3d at 896; 28 U.S.C. §§ 2254(d)(2), 2254(e)(1). Petitioner further offers no specific challenge to the trial court's findings at step three and has not demonstrated that "the trial court had no permissible alternative but to reject the prosecutor's race-neutral justifications." *See Rice*, 546 U.S. at 341.

On direct appeal, the OCCA rejected Petitioner's *Batson* claim on the merits:

Appellant claims he was denied a fair trial when the State used peremptory challenges to remove two prospective jurors who belonged to racial minorities, violating *Batson v. Kentucky*. If a defendant objects to the State's use of a peremptory challenge on such grounds, the prosecutor must offer a race-neutral reason to justify the strike. If the reason given is facially race-neutral, the trial court's decision to allow it will generally be upheld. A trial court's decision in such matters is reviewed for an abuse of discretion.

Appellant claims the prosecutor's reasons for excusing Panelist J. and Panelist M. were not sufficiently race-neutral. In excusing Panelist J., the prosecutor pointed out that this prospective juror had two young children, was unemployed, and was the same age as Appellant. The prosecutor also noted that when speaking with defense counsel, the panelist suggested a potential unwillingness to consider the opinions of other jurors. In excusing Panelist M., the prosecutor pointed out that this prospective juror had a brother-in-law facing a capital murder charge, expressed some difficulty understanding the legal concepts being discussed, and gave his opinion that racial minorities were unfairly treated by law enforcement authorities. The trial court accepted the prosecutor's explanations for both strikes. We have examined the record and find no reason to second-guess the trial court's conclusions.

OCCA Op. at 9-10 (citations omitted).

For the reasons outlined above, the OCCA's acceptance of the prosecution's race-neutral reasons for exercising peremptory strikes was not an unreasonable determination of the facts in this case. Further, the OCCA's conclusion that Petitioner's equal protection rights under *Batson* were not violated is not contrary to or an unreasonable application of clearly established federal law.

### 3. Sixth Amendment Analysis

Petitioner's *Batson* challenge is based in part on the contention that he was deprived of his Sixth Amendment right to a jury drawn from a fair cross-section of the community. *See* Pet'r's Br. at 35-37 (citing U.S. Const. amend. VI; *Duren v. Missouri*, 439 U.S. 357 (1979)).

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren*, 439 U.S. at 364; *accord United States v. Green*, 435 F.3d 1265, 1270-71 (10th Cir. 2006). The OCCA denied this fair-cross-section claim on the merits, citing *Duren* and stating: "[M]uch of his [*Batson*] argument really focuses on the fact that his jury did not mirror the racial and ethnic demographics of the county. Appellant has failed to meet his burden of showing that any racial or ethnic underrepresentation was the product of systematic exclusion in the jury selection process." OCCA Op. at 10 n.8.

Here, as on direct appeal, Petitioner offers some statistics purportedly showing a discrepancy between the county population and the composition for his own jury pool but provides no support to show that any underrepresentation was the result of *systematic* exclusion "inherent in the particular jury-selection process [used]." *See* Pet'r's Br. at 36; Pet'r's OCCA Br. at 36; *Duren*, 439 U.S. at 366-67 (finding that this element had been demonstrated through evidence of discrepancies in every weekly venire for nearly a year). *See generally Alverson v. State*, 983 P.2d 498, 517 & nn.81-82 (Okla. Crim. App. 1999) ("[W]e repeat once again that Oklahoma's method of jury selection is constitutionally firm." (citing *Duren*, 439 U.S. at 364)); *Green*, 435 F.3d at 1270 ("A defendant does not have a right to a jury of any particular composition and the jury actually chosen does not have to mirror the community." (internal quotation marks omitted)). Petitioner therefore has not set forth a reasonable argument that the OCCA's denial of this claim was erroneous, much less shown that the decision is contrary to or an unreasonable application of *Duren*. Habeas relief on Ground Six is not warranted.

### G. Ground Seven: Cumulative Error

In his final argument, Petitioner claims that the accumulation of trial errors raised in Grounds One through Six deprived him of a fundamentally fair trial. *See* Pet'r's Br. at 37-38. The OCCA denied this claim of error on the merits, holding: "Because we have found no error in the preceding claims, there can be no accumulation of error." OCCA Op. at 11.

"In the federal habeas context, the only otherwise harmless errors that can be aggregated are federal constitutional errors, and such errors will suffice to permit relief

under cumulative error doctrine only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness." *Littlejohn v. Trammell*, 704 F.3d 817, 868 (10th Cir. 2013) (internal quotation marks omitted). As that language implies, "[c]umulative error analysis applies where there are two or more actual errors; it does not apply to the cumulative effect of non-errors." *Moore v. Reynolds*, 153 F.3d 1086, 1113 (10th Cir. 1998). Under such review a federal court also considers the impact of any constitutional claims that "have been individually denied for insufficient prejudice." *See Cargle v. Mullin*, 317 F.3d 1196, 1207 (10th Cir. 2003) (holding that because claims involving "substantive prejudice components essentially duplicate the function of harmless-error review," "such claims should be included in the cumulative-error calculus if they have been individually denied for insufficient prejudice").

The Tenth Circuit has recognized that a circuit split exists regarding whether the requirement to conduct a cumulative-error analysis is clearly established federal law under 28 U.S.C. § 2254(d)(1). *See Cole v. Trammell*, 755 F.3d 1142, 1177 n.14 (10th Cir. 2014). However, the Tenth Circuit also notes that its precedent "may very well signal where our court has come down on the issue—*viz.*, that cumulative-error analysis is clearly established law." *See id.* (internal quotation marks omitted).

Having considered *Cole*'s forecast, the undersigned concludes that that the OCCA's decision on Petitioner's cumulative-error claim was not unreasonable or contrary to such clearly established federal law. As outlined above, no *constitutional* errors were present in the state-court proceedings, including with respect to Petitioner's

claims where it is recommended that relief be denied based upon an insufficient showing of prejudice (or presumed prejudice), *see supra* Parts III.B, III.D. Lacking two or more errors to accumulate, Petitioner cannot show a violation of fundamental fairness. *See Littlejohn*, 704 F.3d at 868; *Moore*, 153 F.3d at 1113. Relief on this basis should be denied.

## RECOMMENDATION

As detailed above, it is recommended that the Petition for Writ of Habeas Corpus (Doc. No. 1) be denied.

## NOTICE OF RIGHT TO OBJECT

The parties are advised of their right to file an objection to the Report and Recommendation with the Clerk of this Court by December 16, 2014, in accordance with 28 U.S.C. § 636 and Federal Rule of Civil Procedure 72. The parties are further advised that failure to timely object to this Report and Recommendation waives the right to appellate review of both factual and legal issues contained herein. *See Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the present case.

The Clerk of the Court is directed to electronically forward a copy of this Report and Recommendation to Respondent and to the Attorney General for the State of Oklahoma at fhc.docket@oag.state.ok.us.

ENTERED this 25th day of November, 2014.

CHARLES B. GOODWIN
UNITED STATES MAGISTRATE JUDGE